# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MICHAEL LEO MULHERON**
       **Plaintiff,**

    **v.**                              **Case No. 20-C-1738**

**KILOLO KIJAKAZI,**
**Acting Commissioner of the Social Security Administration**
           **Defendant.**

---

## DECISION AND ORDER

Plaintiff Michael Mulheron applied for social security disability insurance benefits ("DIB"), alleging that he could no longer work due primarily to his hypersensitivity to certain chemicals commonly found in cleaning agents and disinfectants. The Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff failed to present medical evidence substantiating his claimed hypersensitivity, and that his other alleged impairments did not prevent him from working.

In this action for judicial review, plaintiff argues that: (1) the ALJ should have given greater weight to the reports of agency medical consultants who accepted plaintiff's statements regarding his chemical hypersensitivity, and (2) the matter should be remanded for further development of the record. I reject these arguments and affirm. The ALJ explained why she declined to credit the consultants' opinions. See Rice v. Barnhart, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to are citation of a claimant's subjective complaints."). Plaintiff had ample opportunity submit medical evidence during the lengthy pendency of the

case before the Social Security Administration, see Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004) ("It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."), and he fails to demonstrate that remand is warranted for consideration of "new and material" evidence under 42 U.S.C. § 405(g), sentence six.

## I. DISABILITY STANDARD

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act "requires that an individual 'furnish[] such medical and other evidence' of a disability in order to qualify for benefits." Wilder v. Kijakazi, 22 F.4th 644, 2022 U.S. App. LEXIS 158, at *13 (7th Cir. Jan. 4, 2022) (quoting 42 U.S.C. § 423(d)(5)(A)). More specifically, the claimant "bears the burden of proving that [his] impairments are so severe that they prevent [him] from performing any substantial gainful activity." Id. (citing Bowen v. Yuckert, 482 U.S. 137, 147-48 (1987)).

The agency determines disability pursuant to a five-step analysis, asking whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity ("RFC") leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy. Butler v. Kijakazi, 4 F.4th 498, 501 (7th Cir. 2021). "A finding of disability requires an affirmative answer at either step three or step five. The claimant bears the burden

2

of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner typically meets that burden by summoning a vocational expert ("VE") to offer testimony on other jobs a person with the claimant's characteristics might be able to perform. See Overman v. Astrue, 546 F.3d 456, 464 (7th Cir. 2008). Finally, in order to be entitled to DIB, the claimant must establish that his disability arose while he was "insured" for benefits. Briscoe, 425 F.3d at 348.

## II. FACTS AND BACKGROUND

### A.    Plaintiff's Application

Plaintiff applied for benefits in March 2015, alleging a disability onset date of February 25, 2015. (Tr. at 350.) He alleged that he could no longer work due to hypersensitivity pneumonitis, hypersensitivity bronchitis, confusion/inability to focus, blurred vision, violent coughing, jelly-like phlegm, chronic insomnia, and laryngeal spasms. At that time, he stood 6 feet tall and weighed 147 pounds. (Tr. at 384.) He listed previous employment as a piping superintendent for a mechanical contractor from 1998 to 2009, a laborer for a garbage disposal company (part-time) from 2010 to 2013, and as a welder/mechanic from 2013 to 2015. (Tr. at 386.) The agency attempted to collect plaintiff's medical records, but an agency employee noted "have not been able to get any records, no recent exams, says he has a hard time going anywhere gets sick after being exposed to chemicals." (Tr. at 399.)

In a function report, plaintiff indicated that his conditions limited his ability to work due to severe coughing, dizziness, headaches, and dehydration. He indicated that his lungs became filled with fluid and his vision became impaired after a few hours of work. He also

reported severe bouts of diarrhea, wearing adult diapers. (Tr. at 402.) He further reported

impaired sleep. (Tr. at 403.) He was able to prepare meals and perform house and yard work

(Tr. at 404), but rarely went out (Tr. at 406). He alleged that his impairments affected his ability

to bend, walk, see, remember, complete tasks, concentrate, and get along with others. He

further indicated that his strength and endurance had fallen off because of fluid build-up in his

lungs. (Tr. at 407.)

**B.    Consultative Examination**

The agency sent plaintiff for a medical consultative examination with Dr. A. Neil Johnson

on June 28, 2015. Dr. Johnson stated, in the "chief complaints" section of his report:

> Since about 2005 the patient has been identified as having severe
> hypersensitivity pneumonitis bronchitis. He reacts to disinfectants. This has
> prevented him from working his job as a steam fitter where there were a lot of
> disinfectants where he worked. He couldn't go into schools or hospitals. In fact
> he stopped getting colonoscopies 10 years ago because whenever he goes to
> a hospital he gets sick. He has severe shortness of breath and development of
> a congestion in his lungs. He simply now has to avoid ammonia and chloride
> type disinfectants. He has been hospitalized [sic] he has had about six
> emergency room visits with the last in August of 2008. He was accompanied
> today by his fiancé who lives with in a home. If she is doing any cleaning and
> [sic] he leaves the house. Fresh air seems to counteract the reaction to some
> extent. He doesn't drive because he had a DUI four years ago. He is capable
> of driving.

(Tr. at 493.)

Plaintiff also reported some orthopedic problems, including right knee surgeries, right

wrist fusion surgery, and a procedure to his left shoulder in 1992. He stated that he could lift

400 pounds, walk for miles, and sit and stand satisfactorily. He did report some decreased grip

strength on the right where he had a fusion but otherwise had normal use of the hands.

Plaintiff further indicated that he was diagnosed with ulcerative colitis in the 1980s. He stated

that he passed liquid stool 13 times a day but no blood. He weighed 151 pounds at the time,

4

down from 170 a year ago.  (Tr. at 493.)

On physical examination, plaintiff appeared pleasant and cooperative, in no respiratory distress.  He walked normally without use of an assistive device, had no difficulty getting on and off the exam table, and no difficulty squatting, but he was unable to heel and toe walk.  On chest exam, breath sounds were moderately decreased and there were inspiratory wheezes, but little use of accessory muscles.  (Tr at 494.)  On testing, he generally displayed normal range of motion and 5/5 motor strength, but with some slightly decreased grip strength in the right hand.  (Tr. at 495-96.)

Dr. Johnson concluded:

1.    Hypersensitivity pneumonitis.

The patient cannot be exposed to disinfectant.  Ammoniochloride is the offending agent.  He has severe reaction in his lungs and cannot breath[e].  He continues to smoke a pack for 32 years.  He does have moderate decrease of the breath sounds and some wheezing and early use of accessory muscles.  He states that he can walk for miles.  Fresh air helps his breathing.  He was hospitalized twice and had six emergency room visits but he actually avoids going to the hospital because of the exposure to disinfectants.

2.    Ulcerative colitis.

The patient no longer gets colonoscopies because of the exposure to disinfectants.  He states that he gets liquid stool 13 times a day.  There is no blood.  He weighs 151.8 pounds and is 70 inches tall.  His abdominal exam was benign.  There was no tenderness.

3.    Multiples arthralgias.

Despite right knee, right wrist and left shoulder procedures and left hand procedure he has very good grips and strength.  He claims that he can lift 400 pounds.  He can walk for miles and sit and stand normally.

(Tr. at 496-97.)

5

## C.    Agency Decisions

The agency denied plaintiff's application initially on July 9, 2015, based on the review of George Walcott, M.D. (Tr. at 104, 147.) The record at that time contained no recent medical evidence, just the consultative examination report from Dr. Johnson. (Tr. at 108.) Based on the limited evidence before him, Dr. Walcott concluded that plaintiff had no exertional, postural, or manipulative limitations (Tr. at 110), but should avoid all exposure to poor ventilation, chemical fumes, odors, etc. (Tr. at 111.)

Plaintiff requested reconsideration, and the agency then sent him for a psychological consultative exam with Catherine Bard, Psy.D., on December 22, 2015. (Tr. at 502.) Dr. Bard concluded that plaintiff met the criteria for major depressive disorder, within the mild range. Dr. Bard noted that plaintiff sought disability primarily due to medical problems, i.e., chronic sensitivity to chemicals, and that it was beyond the scope of her expertise to evaluate medically based problems. (Tr. at 506.)

On January 12, 2016, the agency maintained the denial (Tr. at 114, 162), based on the reviews of Stacey Fiore, Psy.D., who concluded that plaintiff's mental impairments produced no more than mild limitations and were thus non-severe (Tr. at 120), and Pat Chan, M.D., who agreed with Dr. Walcott's assessment (Tr. at 122-23). Plaintiff then requested a hearing before an ALJ. (Tr. at 155.)

In a pre-hearing brief dated November 20, 2017, plaintiff acknowledged that the "record in this case is sparse." (Tr. at 415.) However, he relied on Dr. Johnson's statement that he has hypersensitivity pneumonitis, with ammoniochloride as the triggering agent. (Tr. 415.) He attached to the brief materials about quaternary ammonium compounds, hypersensitivity pneumonitis, and multiple chemical sensitivity ("MCS"). (Tr. at 418-463.)

6

## D. First Hearing

On December 7, 2017, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also summoned a VE. (Tr. at 35.)

At the outset of the hearing, plaintiff amended the onset date to October 1, 2015, to account for his receipt of unemployment compensation through September 30, 2015. (Tr. at 37.) The ALJ noted that the case was unusual in that the record contained no medical evidence other than the two consultative examination reports commissioned by the agency. The ALJ asked if plaintiff had received any medical treatment and if there were any missing records.

> ATTY: In 2005, there was an industrial accident, and there was some treatment back then. I don't think it's disputed that he's got the hypersensitivity to these chemicals.
>
> ALJ: Right. Okay. But he hasn't been getting any kind of regular treatment for the breathing disorder the last few years?
>
> ATTY: They're looking now at another problem he's got, which is sleep apnea, but I don't think that's disabling. They are researching that. It might be related to this, but –
>
> ALJ: Okay. All right. Well, I just wanted to double-check on that. We'll proceed, then, on the current record.

(Tr. at 38-39.)

Plaintiff testified that he was 53 years old, 6 feet tall and 210 pounds. (Tr. at 41.) He was divorced and lived with his mother. (Tr. at 41.) He completed high school, with additional vocational training as a welder and steam fitter. (Tr. at 43.) He previously worked as a maintenance mechanic, welder, steam fitter, and piping superintendent. (Tr. at 44-47.)

Plaintiff testified that he developed a breathing problem in 2005 while working on a job site where the customer was using a chemical. (Tr. at 48) He testified that he would come in

to work and start coughing violently, and they figured out that he had a chemical intolerance to a disinfectant they were using. (Tr. at 48-49.) He testified that the breathing problem was the primary reason he sought disability. (Tr. at 49.) He had also recently undergone testing for sleep apnea. His providers had "kind of squared away . . . the ulcerative colitis." (Tr. at 49.) Asked about other issues, plaintiff stated: "Other than the getting old aches and pains from previous surgeries, getting arthritis-type feeling, I just take that with the cold weather and aging." (Tr. at 50.) The ALJ asked if he used inhalers or anything for the breathing problem, and plaintiff responded that pharmacists recommended he try an atomizer, which did not work; he also tried different over-the-counter allergy medications, which did not address the coughing problem. (Tr. at 51.) He primarily treated the problem by avoiding exposure to the contaminant. "It's tough to avoid when I don't know if those chemicals are present and it's hit and miss. So, I pretty much made myself a hermit to, you know, control my environment and stay away from stuff." (Tr. at 51.) The ALJ asked if he was affected by chemicals other than this disinfectant, and plaintiff said: "No." (Tr. at 52.) Perfumes, bleach, and vinegar did not bother him. (Tr. at 52.)

Asked what he did with his time, plaintiff testified that liked to go outside and walk. He was able to tend to his personal care. (Tr. at 54-55.) He did some cooking but stepped out when his mother did laundry as he sometimes reacted to detergent. (Tr. at 55-56.) He mowed the lawn and grocery shopped once a month. (Tr. at 56.) He said he sometimes had reactions to cleaning solutions used in stores and gas stations. (Tr. at 57.) Asked if he could work in a clean-air environment, like an office, plaintiff worried about the use of disinfectants in the bathrooms. (Tr. at 59.)

The ALJ asked the VE about a person with no significant exertional or postural

8

limitations, but who would need to avoid all exposure to dust, odors, fumes, and pulmonary irritants, including ammonium chloride and other quaternary ammonium compounds, and who would also require ready access to restroom facilities.  (Tr. at 66.)  The VE testified that such a person could not perform plaintiff's past work but could do other jobs, such as officer worker, cashier, and price marker.  (Tr. at 67.)  If, due to potential exposure to contaminants, such as in the bathroom of the facility, the person would be off task 25% of the workday, all jobs would be eliminated.  (Tr at 67.)

### E.    First ALJ Decision

On March 6, 2018, the ALJ issued an unfavorable decision.  (Tr. at 126.)  The ALJ determined: (1) that plaintiff had not engaged in substantial gainful activity from the alleged onset date of February 25, 2015, through the date last insured of December 31, 2017 (Tr. at 131); that plaintiff had the severe impairments of pneumonitis bronchitis, right wrist deformity, and sleep apnea (Tr. at 131-32);[1] (3) that none of these impairments met or medically equaled a Listing (Tr. at 133); (4) that plaintiff had the RFC to perform a full range of work at all exertional levels, but avoiding all exposure to dust, odors, fumes, and pulmonary irritants, only frequent handling and fingering with the right hand, and requiring ready access to restroom facilities, which precluded performance of his past jobs (Tr. at 133-35); but (5) that he could perform other jobs, as identified by the VE, including office helper, cashier, and price marker (Tr. at 136).  The ALJ accordingly found plaintiff not disabled.  (Tr. at 137.)

### F.    Appeals Council Review

Plaintiff requested review by the Appeal Council, arguing that the agency failed to

_____

[1]The ALJ found plaintiff's ulcerative colitis and depression non-severe.  (Tr. at 132.)

9

demonstrate the existence of jobs he could perform given his chemical sensitivity. (Tr. at 208-12.) On December 21, 2018, the Council granted review based on two errors. First, the ALJ found plaintiff not disabled through December 31, 2017, when the date last insured was actually September 30, 2019. This, the Council noted, left an unadjudicated period that needed to be addressed on remand. Second, the ALJ found that due to his ulcerative colitis plaintiff required "ready access to restroom facilities." However, this workplace accommodation did not adequately reflect the basic work activities affected by the impairment (e.g., the amount of time plaintiff would be off task due to the frequency and duration of bathroom breaks). (Tr. at 143.) The Council accordingly remanded the case for consideration of the entire period at issue, to obtain additional evidence concerning plaintiff's impairments in order to complete the record, and to give further consideration to plaintiff's maximum RFC. (Tr. at 144.)

**G. Medical Evidence**

**1. June 2019 Submission**

**a. Cover Letter**

On June 11, 2019, plaintiff submitted 60+ pages of medical records dated from January 29, 2018, through May 16, 2019. (Tr. at 509.) The records primarily concerned plaintiff's treatment for bilateral hip pain, which included injections, and culminated in a scheduled left hip replacement surgery on May 13, 2019. However, that procedure was aborted when plaintiff aspirated vomit while under anesthesia. In his cover letter, plaintiff stated: "Perhaps this reaction took place because of quaternary compounds." (Tr. at 509-10.)

**b. Records**

On January 29, 2018, plaintiff was seen by orthopedics for evaluation of back and leg

10

pain. On exam, he was noted to have bilateral groin pain, suggestive of hip degenerative joint disease. (Tr. at 515.) The provider noted a history of irritable bowel syndrome but did not mention chemical sensitivity, and on review of systems plaintiff denied respiratory or cardiovascular symptoms. (Tr. at 515.) Nor were such symptoms noted on exam. (Tr. at 516.) X-rays revealed degenerative disc disease at the L5-S1 level (Tr. at 514) and degenerative joint disease, bilateral hips (Tr. at 517).

On February 6, 2018, the provider recommended hip blocks and continued use of NSAIDs as needed. Plaintiff weighed 102.8 kg or 226 pounds. The provider noted no cardiovascular issues. (Tr. at 518.)

On February 20, 2018, plaintiff returned for recheck of his bilateral hip pain, "doing well" one week after hip blocks, "getting around without any difficulties." (Tr. at 521, 537.) He was to follow up in three months for repeat x-rays. The provider again noted no cardiovascular issues, and plaintiff appeared in no apparent distress during the exam. (Tr. at 521.)

On May 22, 2018, plaintiff followed up with orthopedics, noting that the injections worked well until recently. He reported groin pain and difficulty going up and down stairs, getting out of a seated position, and with prolonged walking. The provider recommended additional hip blocks and provided a referral to another physician for left foot pain. The provider again noted no cardiovascular issues, and plaintiff appeared in no apparent distress during the exam. (Tr. at 523.) X-rays revealed mild bilateral hip degenerative joint disease. (Tr. at 522.) On May 24 and June 19, 2018, plaintiff received nerve block injections to his left foot. (Tr. at 526, 529.)

On June 19, 2018, plaintiff returned to orthopedics for recheck of his hip pain, doing well following the hip blocks, getting around without any difficulties. He was to returned for recheck in three months. (Tr. at 531, 536.)

11

On September 18, 2018, plaintiff reported that the hip blocks worked well until recently. The provider recommended further hip blocks (Tr. at 538), performed on September 27, 2018 (Tr. at 533). As with the previous visits, the provider noted no cardiovascular issues or reactions. (Tr. at 538.)

On December 27, 2018, plaintiff was seen by orthopedics for bilateral hip pain, with the provider scheduling further bilateral hip blocks. The provider again noted no cardiovascular symptoms, e.g., chest pains, palpitations, or shortness of breath. He appeared alert and oriented, in no apparent distress. (Tr. at 512.) On January 8, 2019, plaintiff received bilateral hip injections. (Tr. at 541-43.)

On January 17, 2019, plaintiff saw gastroenterology for follow up of multiple GI symptoms. (Tr. at 544.) The provider assessed irritable bowel syndrome with constipation and diarrhea, abdominal bloating, vomiting, and GERD with esophagitis. Plaintiff denied shortness of breath, cough, sputum production, pain with respiration, and hemoptysis. On exam, his lungs were clear to ausculation bilaterally, with no wheezes, rales, or rhonchi, and his respirations were un-labored. (Tr. at 545.)

On January 22, 2019, plaintiff returned to orthopedics for recheck after the January 8 hip blocks, doing well, with 60% relief on the right and 40% on the left. He was getting around without difficulty and reported no chest pain or shortness of breath. (Tr. at 547.)

On February 5, 2019, plaintiff was seen for stomach issues, at times short of breath, and cramping. Plaintiff stated that he had been diagnosed with ulcerative colitis back in the 80s, but the provider did not have those records for confirmation. He did have a colonoscopy in 2017, which showed some mild non-specific colitis; further diagnostic testing did not confirm inflammatory bowel disease. When plaintiff initially presented to gastroenterology, he was

12

having chronic loose stools; he was started on medication and that problem resolved, but he now reported chronic constipation. The provider adjusted his medications. (Tr. at 549.)

On April 30, 2019, returned to orthopedics for follow up after bilateral hip blocks on April 23, 2019. (Tr. at 551, 554.) He reported some relief on the right but no relief on the left. The provider assessed end stage degenerative joint disease, both hips, recommending left total hip arthroplasty. (Tr. at 551.) On May 10, 2019, plaintiff was seen for a pre-operative visit before his May 13 surgery. (Tr. at 557.) The procedure had to be aborted when plaintiff aspirated vomit while under induction of spinal anesthesia. (Tr. at 559-60.) He was hospitalized following the aspiration and improved on medication (Tr. at 562), discharging home on May 16, 2019 (Tr. at 565). The records do not appear to attribute the incident to chemical sensitivity but rather plaintiff's reflux disease. (Tr. at 562-63, 566.)

### 2. December 2019 Submission

#### a. Cover Letter

On December 6, 2019, plaintiff submitted another 30+ pages of material (Tr. at 576), including a news story about a chemical spill on an airplane, which led to a "sickness outbreak" (Tr. at 578-86), as well as additional medical records (Tr. at 588-607). In his cover letter, plaintiff asserted that multiple chemical sensitivity ("MCS") nearly killed him on May 21, 2019. "He was scheduled for surgery and reacted during surgery[.]" (Tr. at 576.)

#### b. Records

The additional records included a May 6, 2019, clearance for the hip surgery (Tr. at 588) and surgery instructions (Tr. at 589-90). They also included duplicates of the February 6, 2018, x-ray report documenting degenerative joint disease, bilateral hips (Tr. at 592); the February

13

6, 2018, office note (Tr. at 593); the May 22, 2018, office note (Tr. at 595); May 24, 2018 note regarding plaintiff's foot issue/injection (Tr. at 597); September 18, 2018, December 27, 2018, January 8, 2019, and April 23, 2019, notes regarding plaintiff's hip injections (Tr. at 598-601); April 30, 2019, and May 10, 2019, notes recommending surgery (Tr. at 602-03); and the May 16, 2019, hospital discharge note (Tr. at 604-06). New records consisted of an April 4, 2019, biopsy report, with results consistent with inflammatory bowel disease (Tr. at 607), and a May 21, 2019, note regarding follow up after his recent hospitalization (Tr. at 587). Providers suspected his recent problems related to acid reflux and anxiety. He was started on medication for mood disorder, his medications for GERD with esophagitis were continued, and Tramadol was increased for hip pain. (Tr. at 587.)

## H. Hearing on Remand

On January 3, 2020, plaintiff appeared with counsel for his hearing on remand. At the outset of the hearing, the ALJ noted that plaintiff had submitted additional medical records. She asked, "is the written record complete?" Plaintiff's counsel responded, "Yes." (Tr. at 73.) Plaintiff had surgeries scheduled, but those records had not yet been created. (Tr. at 74.)

Plaintiff testified that he was 55 years old, with a work history as a piping superintendent and welder mechanic. (Tr. at 77-78.) He lived with his mother and had no income. (Tr. at 83.) Plaintiff indicated that he took medication for IBS and ulcerative colitis, hip pain, and heart palpitations, and used inhalers for his breathing. (Tr. at 84-85.)

Plaintiff testified that he had reactions to chemicals called "Accomplish" and "Whisper," which were contained in sanitizers, disinfectants, and detergents. He experienced this sensitivity since an exposure at a work site. (Tr. at 87.)

Plaintiff testified that he also had problems with his hips, both of which needed to be

14

replaced. His left hip was supposed to be replaced in May 2019, but he aspirated into his lungs minutes before the surgery and the anesthesiologist had to call a halt to the procedure. Plaintiff further testified that he had surgery on his stomach two months ago. (Tr. at 88.) He also mentioned problems with his feet, indicating that he could only walk about 150 to 200 yards on a solid surface before he had to get off his feet. (Tr. at 89-90.) He then said that his hips stopped him before that; he could only walk 100 yards and had to be supported on a grocery cart or cane. (Tr. at 90.) He further mentioned a right hand surgery in December 2019, which limited his ability to carry things with his right arm. (Tr. at 91-93.)

The VE at this hearing classified plaintiff's past jobs as piping fitter supervisor, medium generally, heavy as performed; and welder fitter, medium generally and as performed. (Tr. at 95.) The ALJ then asked about a hypothetical person of plaintiff's age, education, and experience, limited to medium work, with no work around unprotected heights, open flames, or dangerous machinery; no climbing ladders, ropes, or scaffolds; frequent climbing of ramps and stairs, balancing, and stooping; occasional kneeling, crouching, and crawling; and no operation of foot controls. (Tr. at 95-96.) The VE testified that such a person could not perform plaintiff's past work but could do other jobs, such as assembler, sorter, and linen room attendant. (Tr. at 96.)

The second hypothetical assumed a person limited to light work, with no work around unprotected heights, open flames, or dangerous machinery; no climbing ladders, ropes, or scaffolds; frequent climbing of ramps and stairs, balancing, and stooping; occasional kneeling, crouching, and crawling; and no operation of foot controls. (Tr. at 96-97.) The VE said this person could work as an information clerk, rental clerk, and assembler. (Tr. at 97.) Adding a limitation of no concentrated exposure to dust, fumes, gases, or poor ventilation would not

15

impact the light or medium jobs identified. (Tr. at 97.)

Plaintiff's counsel then asked about Dr. Johnson's report:

Q  Dr. Johnson writes this, "The patient cannot be exposed to disinfectant. Ammonium chloride is the offending agent.  He has severe reaction in his lungs and cannot breathe."  If that's true, would he be able to be exposed to cleaning agents that employers use for bathrooms at the worksite.

A  Those cleaning solutions would be around for the cleaner who is going to be utilizing them, however the worker in that role is not responsible for using those products.

Q  But if an employer has a bathroom, would you expect the bathroom to be cleaned with these types of quaternary compounds that he's sensitive to, the ammonium chloride?

A  Yes.

Q  Are there bathroom breaks that are generally allowed in a workday?

A  Yes.  The individual is able to take bathroom breaks at work.
. . .
Q  And would you expect those bathrooms to be cleaned with the chemicals he's sensitive to?

A  Yes.

Q  So, would you expect this particular individual to be exposed to sensitive chemicals each day at work through the bathroom breaks?

A  Yes.

Q  If an individual would have a reaction through that chemical exposure, would he be able to do the job?

A  I really can't say.  If you're limiting the individual to having no exposure to that type of solution in the workplace, that, in vocational terms, would result in no work for such an individual as they would need to be in a sterile environment.  If the individual is required only occasional exposure to those solutions, there would still be work.

(Tr. at 99-101.)

16

## I.    ALJ's Decision on Remand

On January 30, 2020, the ALJ issued an unfavorable decision.  (Tr. at 11.)  The ALJ determined that plaintiff last met the insured status requirement of the Act on September 30, 2019.  Accordingly, plaintiff had to establish disability prior to that date.  (Tr. at 16.)

Turning to the five-step analysis, the ALJ determined, first, that plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of October 1, 2015, through his date last insured of September 30, 2019 (Tr. at 16).  At step two, the ALJ concluded that plaintiff had the severe impairments of degenerative joint disease of the bilateral hips, irritable bowel syndrome, and obesity.  (Tr. at 16.)  The ALJ noted that plaintiff alleged that "hypersensitivity  pneumonitis" and "hypersensitivity bronchitis" limited his ability to work, reporting chemical sensitivity at the consultative examination in 2015.  However, the record contained no documentation of any treatment for chemical sensitivity, nor did the treatment notes document chemical sensitivity, respiratory problems, or other issues related to plaintiff's alleged pneumonitis or bronchitis.  The ALJ noted that the medical record was supplemented following the Council's remand order with 100 pages, which showed "no known allergies" and contained no references to any respiratory impairments or any sensitivities to chemicals.  Indeed, these records showed that plaintiff was able to seek treatment in medical settings where it may be expected he would have exposure to strong antiseptics and other cleaning agents to maintain a safe and healthy environment for patients.  Also, when plaintiff was seen in the clinic and for hip and foot injections he was not noted to have any difficulty with respiration, and he repeatedly denied any issues with shortness of breath or chest pain.  The ALJ concluded: "Thus, the record fails to document a severe respiratory impairment or severe chemical allergies or 'sensitivities.'"  (Tr. at 17.)

17

The ALJ also noted references in the record to depression, including a diagnosis at the psychological consultative exam four years earlier. However, there was no evidence plaintiff sought treatment for depressive symptoms or any other mental health issue. The more recent medical records noted appropriate mood and affect, without anxiety or depression. (Tr. at 17.) Accordingly, after further reviewing the areas of mental functioning set out in the regulations, the ALJ found no severe mental impairment. (Tr. at 17-18.)

At step three, the ALJ determined that none of plaintiff's impairments met or equaled the severity of a listed impairment. (Tr. at 19.) Plaintiff's joint impairment did not result in inability to ambulate effectively, and his inflammatory bowel disease likewise did not produce the specific clinical findings required. (Tr. at 19-20.)

Prior to step four, the ALJ found that plaintiff had the RFC to perform medium work, except no working around unprotected heights, open flames, or dangerous machinery; no climbing ladders, ropes or scaffolds; frequent climbing of ramps and stairs, balancing, and stooping; occasional kneeling, crouching, and crawling; no operation of foot controls; and no concentrated exposure to dust, fumes, gases, or poor ventilation. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 20.)

The ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence of record. At the hearing, plaintiff testified that he needed both hips replaced, stating that he could walk 150-200 yards but needed a cane or grocery cart to lean on. (Tr. at 21.) Notably, there were no treatment records from the alleged onset date through December 2017, just two consultative examinations (one physical, the other mental) ordered by the agency. Following the June 2015

18

physical exam, Dr. Johnson diagnosed ulcerative colitis. However, during the exam plaintiff walked normally without an assistive device, had no difficulty getting on and off the exam table, and displayed normal range of motion, full motor strength, and intact sensation. (Tr. at 21.)

Several years later, in January 2018, a provider noted bilateral groin pain, and x-rays revealed degenerative joint disease of the bilateral hips. A February 2018 bilateral hip exam identified severe pain upon internal and external rotation, flexion, and extension, and 4/5 hip flexion strength. Plaintiff was diagnosed with bilateral hip pain and advised to continue taking over-the-counter non-steroidal anti-inflammatory drugs. Hip block injections were also recommended. During this time, plaintiff also had a bout of left foot neuritis. However, in June 2018, plaintiff reported that he was getting around without any difficulties and doing well. Hip x-rays revealed mild degenerative joint disease. (Tr. at 21.)

Plaintiff reported some benefit from treatment. In February 2018, he reported doing well after a hip block, and in May 2018 he reported some relief with a cortisone injection. After complaining of an exacerbation in September 2018, he underwent bilateral hip injections in January 2019, reporting significant relief. He reported that he was getting around without any difficulties. (Tr. at 22.)

In April 2019, plaintiff reported groin and hip pain, walking with a severe limp. He was diagnosed with end stage degenerative joint disease of both hips, left greater than right, with a recommendation for left total hip arthroplasty. He was scheduled to undergo the surgery in May 2019, but it was canceled after he became ill. He was prescribed increased Tramadol in May 2019, and the record contained no treatment notes thereafter. (Tr. at 22.)

The record also contained limited evidence regarding plaintiff's GI complaints. The consultative examiner diagnosed ulcerative colitis in June 2015 based on plaintiff's statements

19

that he had been diagnosed with such in the 1980s and continued to experience symptoms. Plaintiff made no mention of GI complaints when seen for leg and back pain in January 2018. In January 2019, plaintiff had a GI evaluation and was diagnosed with IBS and prescribed medication. In February 2019, he was seen for stomach issues, shortness of breath, and cramping. The provider noted that plaintiff had a lifelong history of GI problems, reporting he had been diagnosed with ulcerative colitis in the 1980s. The provider did not have records for confirmation, and a 2017 colonoscopy showed some mild nonspecific colitis and further diagnostic testing did not confirm inflammatory bowel disease. Medications resolved his loose stool complaints, but he now reported problems with chronic constipation, for which his medications were adjusted. The ALJ noted that plaintiff had not been admitted for treatment of IBS, and the record failed to document any significant weight loss; indeed, the record showed plaintiff had gained weight. (Tr. at 22.) The records documented weights ranging between 223 and 240 pounds, producing a body mass index ("BMI") of 32 to 35. (Tr at 23.)

The ALJ found plaintiff's claims inconsistent with the record, noting the considerable gaps in treatment, with no medical records from the alleged onset date through December 2017. The record documented that hip injections provided good relief of plaintiff's symptoms; he was referred for hip replacement, but there were no records documenting any treatment after the surgery was canceled due to illness in May 2019. Prescribed medication was effective for his IBS symptoms. At the consultative exam, plaintiff reported that he could walk for miles, contrary to his hearing testimony that he could walk for 150-200 yards and needed to lean on a cane or grocery cart. (Tr. at 23.)

As for the opinion evidence, the agency medical consultants opined that plaintiff's IBS was non-severe. The ALJ gave this opinion little weight, as the subsequent treatment notes

20

documented that IBS was a severe impairment. (Tr. at 23.)

The medical consultants opined that plaintiff had no exertional or postural limitations but was limited to no exposure to poor ventilation, chemical fumes, or odors. The ALJ gave this opinion limited weight because the consultants did not review the record in its entirety. Indeed, the consultants had before them just two consultative exam reports; the only medical treatment records were added later. The ALJ gave the pulmonary limitations some weight because of the possible exacerbation of plaintiff's alleged respiratory symptoms (according all reasonable doubt to plaintiff's complaints regarding "chemical sensitivities"). (Tr. at 23.)

Examining consultant Dr. Johnson opined that plaintiff could not be exposed to disinfectants, but the ALJ gave this opinion very limited weight because it was clearly based only on plaintiff's statements; there were no medical records in the file at the time of the consultative exam showing any type of chemical sensitivity or history of respiratory impairment. Nor was there any documentation of a respiratory impairment or allergies in the expanded medical record. (Tr. at 23.)

In light of plaintiff's obesity and musculoskeletal impairment, the ALJ restricted plaintiff's climbing and postural movements. (Tr. at 23-24.) The ALJ found that these limitations accommodated possible exacerbations of hip pain, as well as possible exacerbations of stomach pain with activities such as stooping, crouching, or crawling. The ALJ further found plaintiff capable of medium work, given the report of pain relief and lack of any difficulty in getting around after the injections. Further, although the record failed to document a severe respiratory impairment, to avoid any possible exacerbation of respiratory complaints, the ALJ limited plaintiff's exposure to dusts, fumes, gases, or poor ventilation. The IBS was accommodated with normal breaks and postural restrictions; the record did not, the ALJ found,

21

support allegations of the need for frequent bathroom breaks. (Tr. at 24.)

At step four, the ALJ found that plaintiff could not perform his past relevant jobs of piping fitter supervisor and welder fitter. (Tr. at 24.) At step five, however, the ALJ found that plaintiff could perform other jobs existing in significant numbers, as identified by the VE, including assembler, sorter, and linen room attendant. (Tr. at 25.) The ALJ accordingly found plaintiff not disabled and denied the application. (Tr. at 25-26.)

## J.    Second Request for Appeals Council Review

Plaintiff again sought review by the Appeals Council (Tr. at 323), arguing that the agency did not meet its burden at step five, citing the VE's testimony that there would be some exposure to chemicals at the proposed job sites (Tr. at 325). On September 23, 2020, the Appeals Council denied plaintiff's request for review. (Tr. at 1.) The Council noted that plaintiff submitted 15 pages of additional medical records, dated June 25, 2020. However, the ALJ decided the case through September 30, 2019, and the Council found that this additional evidence did not relate to the period at issue. (Tr. at 2.) The Council did not exhibit and include the additional evidence in the record.[2]

With the denial, the ALJ's 2020 ruling became the final decision of the Commissioner for purposes of judicial review. See Butler, 4 F.4th at 500. This action followed.

_____

[2]Plaintiff indicates that he submitted additional evidence to the Council twice: on August 31, 2020, and September 22, 2020. The Council rejected the former submission because the evidence included was generated after September 30, 2019. Plaintiff does not challenge that decision. See Musonera v. Saul, 410 F. Supp. 3d 1055, 1058-59 (E.D. Wis. 2019) (discussing the circumstances under which a claimant can obtain judicial review of the Council's refusal to consider additional evidence). The latter submission was not considered, as it apparently did not reach the Council before the order issued. (Pl.'s Br. at 2, 3-4.) Plaintiff attaches the September 22, 2020, evidence to his brief in this court. (Pl.'s Br. at 5, 9.)

## III.  DISCUSSION

**A.     Standard of Review**

The court will uphold an ALJ's decision if it uses the correct legal standards, is supported by substantial evidence, and builds an accurate and logical bridge from the evidence to the conclusions.  Jeske v. Saul, 955 F.3d 583, 587 (7th Cir. 2020).  "Substantial evidence" means such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.  Id.  The court reviews the entire record, but it will not replace the ALJ's judgment with its own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility.   Id.

The correctness of an ALJ's decision depends on the evidence that was before her. Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993).  Accordingly, a claimant cannot demonstrate error through the submission of additional evidence.  However, the court may, pursuant to 42 U.S.C. §  405(g), sentence six, remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." "New" evidence means evidence not in existence or available to the claimant at the time of the administrative proceeding.  Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003).  Evidence is "material" if there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered.  Id.  Evidence that has been submitted to and rejected by the Appeals Council does not qualify as "new" within the meaning of § 405(g).  Stepp v. Colvin, 795 F.3d 711, 726 n.8 (7th Cir. 2015).

23

**B.     Plaintiff's Arguments**

**1.     Evidence of Chemical Sensitivity**

Plaintiff begins his argument by noting that the burden at step five rests with the Commissioner.  (Pl.'s Br. at 4.)  Where the claimant has significant non-exertional limitations, the Commissioner will ordinarily meet that burden by obtaining testimony from a VE regarding jobs a person with the claimant's limitations could still do.  In this case, the VE testified that a person who could tolerate occasional exposure to chemical agents could work but that a limitation to no exposure would result in no work.  (Tr. at 101.)  Plaintiff argues that the question before the court is whether the Commissioner has medical proof he can tolerate occasional exposure to quaternary compounds.  He contends that the burden of proof on that point is on the Commissioner: the Commissioner must prove that he can tolerate occasional exposure to quaternary compounds.  (Pl.'s Br. at 4.)

The Commissioner bears the step five burden of producing evidence regarding jobs a person with the claimant's limitations could do, but the "claimant bears the burden of producing medical evidence that supports [his] claims of disability."  Eichstadt v. Astrue, 534 F.3d 663, 668 (7th Cir. 2008); see also Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017) ("It was Summers's burden, not the ALJ's, to prove that she was disabled."); Weaver v. Berryhill, 746 Fed. Appx. 574, 579 (7th Cir. 2018) ("It was Weaver's burden to establish not just the existence of the conditions, but to provide evidence that they support specific limitations affecting her capacity to work.").  Accordingly, it was plaintiff's burden, not the ALJ's, to establish the existence of a disabling environmental limitation.  And as the ALJ noted, the medical evidence before her failed to establish such an impairment/limitation.

24

Plaintiff next argues that the ALJ erred in discounting Dr. Johnson's opinion that he could not be exposed to disinfectants. (Pl.'s Br. at 4-5; Tr. at 496.) As indicated above, the ALJ gave this opinion:

> very limited weight because it is clearly based only on the claimant's statements; there were no medical records in the file at the time of the consultative exam showing any type of chemical sensitivity or history of respiratory impairment, or treatment/evaluation for such. Nor is there any documentation of a respiratory impairment or allergies in the expanded medical record.

(Tr. at 23.)

It is well-settled that "ALJs may discount medical opinions based solely on the patient's subjective complaints." Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). Plaintiff cites no authority to contrary. Nor does he contest the ALJ's finding that Dr. Johnson's opinion on this issue was, in fact, based on plaintiff's statements. Plaintiff notes that he explained the severity of his predicament at the hearing (Pl.'s Br. at 5), but the ALJ was not required to accept his testimony. See 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged[.]").[3] Plaintiff argues that the absence of records documenting chemical sensitivity does not undermine Dr. Johnson's credibility (Pl.'s Br. at 5), but he also cites no authority in support of this proposition. Nor does he address the ALJ's finding that the subsequent treatment records undermined any

---

[3]Giving him the benefit of the doubt, the ALJ did give some weight to plaintiff's testimony, limiting him from concentrated exposure to avoid possible exacerbation of his respiratory complaints. (Tr. at 23.) Contrary to plaintiff's suggestion in reply, however, this does not mean the ALJ found an MCS impairment. (Pl.'s Rep. Br. at 1, 3.) The ALJ specifically rejected plaintiff's claim of a severe respiratory impairment. (Tr. at 17.)

claim that plaintiff had to avoid all exposure to disinfectants. (Tr. at 17, 23.) In sum, the ALJ reasonably explained why Dr. Johnson's opinion on this issue was unsupported by and inconsistent with the record. See 20 C.F.R. § 404.1527(c)(3), (4).

Plaintiff contends that the ALJ erred by not developing the record, especially when the Appeals Council wanted supplementation. (Pl.'s Br. at 5, citing Rosa v. Callahan, 168 F.3d 72, 80 (2nd Cir. 1999).) Plaintiff added around 100 pages of material to record following the remand, and at the hearing his lawyer acknowledged that the written record was complete. (Tr. at 73.) While the ALJ has a duty to fully and fairly develop the record, a represented claimant, like plaintiff, is presumed to have made his best case before the ALJ. Harris v. Saul, 835 Fed. Appx. 881, 885 (7th Cir. 2020) (citing Skinner v. Astrue, 478 F.3d 836, 842 (7th Cir. 2007)); see also Thomas v. Colvin, 745 F.3d 802, 807 (7th Cir. 2014) ("An ALJ is under an obligation to develop a full and fair record, but this obligation is not limitless.") (internal citations and quote marks omitted). Plaintiff develops no argument that the ALJ abused her discretion by accepting counsel's statement that the record was complete. See Harris, 835 Fed. Appx. at 885 (affirming where the claimant's counsel told the ALJ the record was complete); see also Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir. 2009) ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather, even when the claimant lacks representation.").[4]

Plaintiff notes that the agency reviewers gave great weight to Dr. Johnson's statement (Tr. at 110, 121) and argues that the ALJ erred by overlooking the agency's own view of the

---

[4]As the Commissioner notes, plaintiff was at various points during the administrative proceedings advised that he was required to inform the agency of all evidence related to his claim. (Def.'s Br. at 8-9.)

26

opinion (Pl.'s Br. at 5). The ALJ was not bound by the agency's views. See Szwandrok v. Bowen, 658 F. Supp. 847, 850 (N.D. Ill. 1987) (citing 20 C.F.R. § 404.1546). Plaintiff cites Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991), which held that an ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence. But this assumes the claimant has first established a medical impairment reasonably likely to be the cause of the pain or other symptoms. Id. at 346. Bunnell does not stand for the proposition that a claimant can establish a disabling impairment based solely on his own testimony.

Plaintiff attaches to his reply brief portions of the opinion in Gaudette v. Berryhill, No. CV 16-137-M-DLC-JCL, 2018 U.S. Dist. LEXIS 97032 (D. Mont. June 8, 2018), but that case is distinguishable on this very basis. In Gaudette, the "ALJ determined that Gaudette met her burden of showing that she suffered from MCS which could reasonably be expected to cause the symptoms of which she complains." Id. at *20. But in violation of Bunnell, the ALJ then discounted the claimant's testimony because the objective medical evidence did not support the severity of her alleged symptoms, making several unfounded assumptions about the nature of MCS. Id. at *18. In the present case, the ALJ found that plaintiff failed to establish the existence of a severe chemical sensitivity impairment. (Tr. at 17.) Contrary to plaintiff's suggestion (Pl.'s Rep. Br. at 2-3), nothing in Gaudette undermines the ALJ's decision to discount Dr. Johnson's opinion because it was based solely on plaintiff's statements.

Plaintiff notes that as an agency consultant Dr. Johnson is highly qualified, and that an examining source opinion is generally entitled to more weight that the opinion of a reviewing physician. (Pl.'s Br. at 5-6.) This is correct as a general matter, but it does not address the reasons the ALJ provided here: Dr. Johnson had before him no records substantiating MCS,

27

and the subsequent treatment records failed to mention it.

Plaintiff next argues that the ALJ erred in his consideration of the reports from Drs. Walcott and Chan, who opined that he should avoid all exposure to environmental irritants. (Pl.'s Br. at 6; Tr. at 111, 122.) The ALJ gave:

> this opinion limited weight because the State agency did not review the records in entirety. Indeed, since the State Agency consultants reviewed the medical evidence (only two consultative exam reports at that time), the record has been supplemented with the only records of any medical treatment. The pulmonary limitations are given some weight because these limitations are consistent with possible exacerbation of alleged respiratory symptoms (according all reasonable doubt to the claimant's complaints in regard to "chemical sensitivities").

(Tr. at 23, record citations omitted.) Plaintiff argues that there is no basis to believe all records were not reviewed; he further contends that none of the subsequent records would change the consultants' opinions. (Pl.'s Br. at 7.) The consultants plainly could not have reviewed the medical treatment records because they were not in the file at the time. And as the ALJ noted, none of the medical records later submitted substantiate severe chemical sensitivity. In reply, plaintiff contends that his vomiting during the May 2019 surgery was a reaction to chemicals. (Pl.'s Rep. Br. at 1.) But he provides no record citation in support of this claim, and the treatment notes appear to attribute the vomiting to reflux, not chemical sensitivity. (Tr. at 562-63, 566, 587.)

Plaintiff contends that the ALJ failed to evaluate every medical opinion in the record, in that the names of Dr. Chan and Dr. Walcott were never mentioned. (Pl.'s Br. at 7.) The argument is meritless; the ALJ cited both consultant opinions and discussed them over two paragraphs of his decision. (Tr. at 23.) There is no requirement that he mention the doctors by name. Plaintiff cites Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004), in which the court discussed the standards for evaluating treating source opinions; it is unclear how this

28

case supports plaintiff's argument here. Plaintiff also faults the ALJ for considering the consultants' opinions together. (Pl.'s Br. at 7.) Since the opinions were the same, it would be needless formality to require the ALJ to repeat his analysis. See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) ("To require the ALJ to repeat such a discussion throughout his decision would be redundant.").[5]

Following the close of briefing, plaintiff submitted a notice of filing attaching a district court decision from Alaska addressing a chemical sensitivity claim. (R. 21.) He asks that the opinion be considered but does not otherwise explain how it helps him. See Xue Juan Chen v. Holder, 737 F.3d 1084, 1085 (7th Cir. 2013) ("[W]e cannot write a party's brief, pronounce ourselves convinced by it, and so rule in the party's favor. That's not how an adversarial system of adjudication works."). In any event, the case is distinguishable. In that case, the ALJ rejected the opinion of a treating source, Dr. Buscher,

> because it was based solely on plaintiff's subjective complaints. This was not a legitimate reason because Dr. Buscher ran a number of diagnostic tests and labs. In fact, Dr. Buscher noted in his January 2016 opinion that plaintiff's office visits included allergy testing and laboratory testing and that the results of the allergy testing were extreme as to mold, dust, and chemicals and that the laboratory testing showed elevated lead and mercury. As another example, on September 5, 2013, Dr. Buscher noted that plaintiff's labs "indicate[d] exposures to solvents such as xylene, toluene."

Cabe v. Saul, No. 5:20-cv-0012-HRH, 2021 U.S. Dist. LEXIS 116862, at *8-9 (D. Alaska June 23, 2021). Such corroborating evidence missing in the present case.

---

[5]In his main brief, plaintiff cites 20 C.F.R. § 416.920c in support of this argument (Pl.'s Br. at 7), but that regulation applies to claims filed after March 27, 2017. Plaintiff filed this claim in 2015. In reply, he cites 20 C.F.R. § 404.1527(f)(2). (Pl.'s Rep. Br. at 2.) This regulation applies to claims filed before March 27, 2017, but sub.(f)(2) concerns the articulation requirement regarding opinions from sources who are not acceptable medical sources and from non-medical sources. Section 404.1527(c) requires the ALJ to evaluate "every medical opinion" received, but nothing in the regulation says the ALJ must list each source's name.

## 2. Sentence Six Remand

Plaintiff states that a remand to obtain a diagnosis from other than Dr. Johnson could be useful, as that would satisfy the ALJ's concerns. (Pl.'s Br. at 7.) However, he cites no authority for the court to remand to fill such an evidentiary gap. As indicated, the court generally defers to the ALJ's judgment regarding "about how much evidence is sufficient to develop the record fully and what measures (including additional consultative examinations) are needed in order to accomplish that goal." Poyck v. Astrue, 414 Fed. Appx. 859, 861 (7th Cir. 2011). "Particularly in counseled cases, the burden is on the claimant to introduce some objective evidence that further development of the record is required." Id. The case plaintiff does cite, Strauss v. Comm'r of the SSA, 635 F.3d 1135, 1138 (9th Cir. 2011), discussed remand for further proceedings/record development v. an immediate award of benefits; it does not support plaintiff's argument here.

Plaintiff notes that the court can remand pursuant to § 405(g), sentence six, if there is a reasonable probability that new evidence would change the ALJ's decision. (Pl.'s Br. at 7.) Plaintiff cites medical records from July 2019 mentioning "multiple chemical sensitivity syndrome." (Pl.'s Br. at 7; see Pl.'s Br. at 10, 13, 14.) He notes that these records post-date the first hearing and are within the ambit of record development ordered by the Appeals Council. (Pl.'s Br. at 7-8.) He also cites a September 2020 record documenting "hypersensitivity pneumonitis" (Pl.'s Br. at 8; see Pl.'s Br. at 11, 12), which could not have been discovered prior to either hearing. He contends that there is good cause to consider these attached records, which he apparently mailed to the Appeals Council on September 22, 2020. (Pl.'s Br. at 8; see Pl.'s Br. at 9.)

Plaintiff's two-paragraph argument fails to establish the elements for a sentence six

30

remand. The July 2019 records are not "new." They were in existence prior to the January 2020 hearing, and plaintiff makes no claim that they were unavailable to him prior to that hearing. Nor does he attempt to explain why he failed to include these records with the 100 pages of material he submitted prior to the second hearing; as indicated, he told the ALJ at that time that the record was complete. See Schmidt v. Barnhart, 395 F.3d 737, 742-43 (7th Cir. 2005):

> It is undisputed that these records existed and were available to Schmidt at the time of the administrative hearing. . . . Schmidt has offered no explanation as to why the records were not submitted to the ALJ in time for consideration as part of the record in the administrative proceeding. Clearly then, this evidence is not "new" for purposes of our authority to order a remand pursuant to 42 U.S.C. § 405(g).

The September 2020 records are "new," in that they were created after the hearing on remand, but plaintiff fails to explain how they are "material." The ALJ issued her decision in January 2020, addressing a period that ended on September 30, 2019. See id. at 742 ("Medical records documenting Schmidt's medical condition as it existed in 2002-03 could not have affected the bottom line of a decision rendered in December 2000."). Records from medical treatment taking place after the date late insured "are relevant only to the degree that they shed light on [the claimant's] impairments and disabilities from the relevant insured period." Million v. Astrue, 260 Fed. Appx. 918, 921-22 (7th Cir. 2008). These records, which relate to a pre-anesthesia evaluation for a right knee arthroplasty surgery, list "Hypersensitivity pneumonitis" in the "Review of Systems" section (Pl.'s Br. at 11) and "Name of Problem" section (Pl.'s Br. at 12), but do not further elaborate on the nature or severity of the impairment. Plaintiff develops no argument as to how this notation, without more, could have changed the outcome of the case.

31

Given these failures, it is unnecessary to further review the substance of the additional records in detail. I do note, however, that the submission appears to be incomplete. <u>See</u> 20 C.F.R. § 1512(a) ("When you submit evidence received from another source, you must submit that evidence in its entirety, unless you previously submitted the same evidence to us or we instruct you otherwise."). The records from plaintiff's July 18, 2019, primary care visit consist of 3 pages (<u>see</u> Pl.'s Br. at 13, "Page 1 of 3"), yet plaintiff submits just 1 page. The records from his July 20-21, 2019, hospital admission consist of 18 pages (<u>see</u> Pl.'s Br. at 10, "Page 1 of 18"; Pl.'s Br. at 14, "Page 5 of 18"), yet plaintiff submits just 2 pages of that collection. And the records from September 2-3, 2020, appear to consist of 8 or 9 pages (<u>see</u> Pl.'s Br. at 11, "Page 1 of 8"; Pl.'s Br. at 12, "Page 5 of 9"), yet plaintiff submits just 2 pages.

Given their incompleteness, it is impossible to meaningfully evaluate the potential impact of these materials.[6] In sum, plaintiff cannot hope to obtain a sentence six remand without

---

[6]The July 18, 2019, record indicates plaintiff was seen by his primary care provider for hospital follow up. The note indicates he "has a history of severe reaction to dimethyl ammonium chloride. He has had chemical pneumonitis. . . . About 10 days ago he had a severe hypersensitivity reaction to a disinfectant. He went to the emergency room and then was admitted for an observation stay. He received several doses of IV Solu-Medrol and was discharged on a tapering dose of prednisone. He was also given a Breo inhaler and an albuterol inhaler." (Pl.'s Br. at 13.) The provider assessed uncontrolled persistent asthma, providing a prescription for a nebulizer; edema, likely the result of the steroids; and hypertension, well-controlled. The note provided does not otherwise mention the chemical sensitivity or recommend specific treatment therefor. (Pl.'s Br. at 13.) The July 20-21, 2019, record lists "Multiple chemical sensitivity syndrome," but plaintiff attributed his symptoms at that time to a course of "steroid therapy received when he presented to the hospital for an asthma exacerbation 2-3 weeks ago." (Pl.'s Br. at 10.) The July 21, 2019, discharge summary indicates plaintiff has "moderate persistent asthma that is made worse by exposure to disinfectants. Patient was hospitalized earlier this month when he used a restroom and a court room [at] Wausau and came to the emergency room with significant wheezing." (Pl.'s Br. at 14.) At that time, he complained of peripheral edema, apparently related to the steroids and recent humid weather. He was admitted for further evaluation and treatment. (Pl.'s Br. at 14.) As indicated above, the September 2-3, 2020, records, which relate to a pre-anesthesia evaluation for a right knee arthroplasty surgery, list "Hypersensitivity pneumonitis" in the

giving the court more to go on.  In reply, plaintiff argues that the new evidence contains a

diagnosis of MCS, filling a gap caused by the discounting Dr. Johnson's opinion, which could

lead to a different result.  (Pl.'s Rep. Br. at 3.)  However, he does not otherwise address the

flaws in his sentence six argument, clearly pointed out by the Commissioner in response.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this action is

dismissed.  The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 2nd day of February, 2022.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge

---

"Review of Systems" section (Pl.'s Br. at 11) and "Name of Problem" section (Pl.'s Br. at 12), but do not discuss the nature or severity of the impairment.